UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES FRANCIS BOYD,

     Plaintiff,

v.

COLIN MCCABE,
JEFFREY MASSERANG, JR., and
UNKNOWN OFFICERS OF THE
WARREN POLICE DEPARTMENT,

     Defendants.

Case No. 16-cv-12741
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

## OPINION AND ORDER ACCEPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [60] AND GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT [49]

Charles Boyd was out driving with friends at 1:30 a.m. on May 18, 2014. After the group of four stopped at a 7-Eleven, their car was pulled over by two City of Warren police officers, Colin McCabe and Jeffery Masserang.

As the two officers tell it, they stopped the car because the person in the front passenger seat looked ill. Then, when they approached the vehicle, they observed vomit on the passenger side door and smelled marijuana. According to the officers, they ordered Boyd out of the car multiple times but he paid them no mind and continued to text on his phone. As Boyd finally exited the car, McCabe tried to take Boyd's phone out of his hands. In response, Boyd grabbed McCabe's wrist and then, after McCabe pushed Boyd back toward the car, Boyd grabbed his uniform. The two ended up in the backseat of the car (where Boyd had been sitting). McCabe eventually had to drag Boyd out of the car and, even then, Boyd continued to resist. So McCabe struck Boyd to cause him to let go of McCabe's arm and finally handcuff him.

Boyd's account is quite different. He says that as he exited the vehicle, McCabe slapped at his phone, slammed his head into the car door, and the two ended up in the backseat. While in the backseat, McCabe choked him. Then, says Boyd, after he was dragged feet first out of the car so his head hit the ground, McCabe got on top of him and started punching him. Meanwhile, Masserang did nothing to stop McCabe's assault. So Boyd sued McCabe and Masserang for, among other things, excessive force in violation of the Fourth Amendment.

McCabe and Masserang now seek summary judgment. (ECF No. 49.) Executive Magistrate Judge R. Steven Whalen, to whom all pretrial matters have been referred, recommends this Court grant the officers' motion. (ECF No. 60.) As will be explained in greater detail below, the videos of the arrest and of the booking process do not clearly discredit Boyd's version of the events. And, on summary judgment, the Court must accept as true the non-moving party's account unless blatantly contradicted by video or other indisputable evidence. As that is not the case here, the Court must accept Boyd's account. And, on that account, McCabe and Masserang are not entitled to summary judgment on all of Boyd's claims.

## I.

At the summary-judgment stage, it usually suffices to present the non-moving party's version of the facts supplemented by any undisputed evidence. Here, however, the analysis is aided by presenting both the officers' account and Boyd's.

### A.

The Court starts with the officers' take.

#### 1.

At 1:30 in the morning on May 28, 2014, McCabe and Masserang were on patrol in Warren, Michigan. (ECF No. 49, PageID.1236–1237.) From their patrol car, the two officers spotted a

Pontiac G6 parked in a 7-Eleven parking lot. (ECF No. 49, PageID.1237.) Masserang recalls seeing a woman partly hanging out of the passenger-side window of the Pontiac and thought she might be ill. (ECF No. 49, PageID.1237.) So the officers drove to the parking lot to investigate. A short time later, the Pontiac departed the 7-Eleven. (ECF No. 49-6, PageID.1237.)

The officers followed the Pontiac for about a block before pulling the car over. (ECF No. 49, PageID.1238.) Masserang recalls getting out of the patrol car, approaching the passenger side of the Pontiac, and seeing "vomit running along the side of it." (ECF No. 49, PageID.1239.) He also recalls smelling marijuana. (*Id.*) McCabe, who approached the Pontiac on the driver's side, remembers smelling marijuana too. (ECF No. 49, PageID.1357.) McCabe asked the driver for his license; the driver indicated that it was expired; it turned out that it was. While McCabe arrested the driver and put him in the back of the patrol car, Masserang remained on the passenger side of the Pontiac.

Boyd and Drew West were in the back seat of the Pontiac; Boyd on the driver side, West on the passenger side. The rear passenger-side window was partly down and Masserang, through that window and across West, conversed with Boyd. Masserang recalls Boyd being "abrasive." (ECF No. 49-6, PageID.1242.) For example, "When I asked Mr. Boyd for his ID, he asked me for my ID." (ECF No. 49, PageID.1241.) Masserang recalls Boyd getting his ID out of his wallet, but never offering it to him. (*Id.*) Masserang also remembers that despite ordering Boyd out of the vehicle "several times," Boyd remained inside. (ECF No. 49, PageID.1243.)

By this time, McCabe had returned to the Pontiac. McCabe opened Boyd's door to let Boyd out. According to McCabe, he and Masserang collectively told Boyd to get out of the Pontiac about 10 times. (ECF No. 49-7, PageID.1363.) McCabe recalls, "I nudge[d] [Boyd] with my flashlight so he [could] see that the door is open because he ha[d]n't . . . looked at me yet." (ECF No. 49,

PageID.1362.) Boyd was preoccupied with his cell phone. "[F]inally," McCabe recalls, Boyd "turn[ed] and step[ped] out of the car." (ECF No. 49, PageID.1363.)

As Boyd exited the vehicle, McCabe reached for Boyd's phone, which led to an altercation. McCabe recalls, "I reach and I grab his phone. . . . It was clearly distracting [him] and [I] reached and took his phone out of his hand. . . . [H]e lunge[d] forward and he grab[bed] my [left] wrist to try and get his phone back." (ECF No. 49, PageID.1364; *see also* ECF No. 54, PageID.1485.) McCabe had been trained to push Boyd "towards the car, take [him] off balance, and then go back the other way." (ECF No. 49, PageID.1365.) So, according to McCabe, he tried to use his right hand to push Boyd back toward the vehicle. But, says McCabe, Boyd buckled and McCabe ended up on top of him in the back seat. (ECF No. 49, PageID.1365.) McCabe recalls Boyd "grabb[ing] the front of my shirt and . . . pulling me backwards." (ECF No. 49, PageID.1365.)

A struggle in the backseat of the Pontiac ensued. According to McCabe, "[Boyd's] just a hold of me and I'm just trying to push back and try to get out of the car because I mean that's an awful place for me to be." (ECF No. 49, PageID.1367.) McCabe recalls Boyd and West grabbing onto each other and so it became something of a "tug-of-war with this kid." (ECF No. 49-7, PageID.1368.) Masserang, who was still on the passenger side, also recalls Boyd and West being "locked together" and having to "reach in through the [passenger-side] window and separate him." (ECF No. 49, PageID.1247.) Eventually, McCabe struggled to his feet and pulled Boyd out of the backseat by his feet. (ECF No. 49-7, PageID.1367–1368.)

McCabe recalls the struggle continuing once Boyd was out of the car. "[H]e comes out on his back, I flip him over. As he flips over he kind of pulls his arms and legs in and he grabs a hold of my left wrist and pulls it underneath him." (ECF No. 49-7, PageID.1369.) McCabe explains: "Once he grabs a hold of my arm and pulls it underneath him, I punched him in the face. I struck

him in the face with a closed fist[,] and the reason we do that is it's a distractionary technique and it's also pain compliance and so it's supposed to distract him from what he's doing and make him realize that his face hurts." (ECF No. 49-7, PageID.1369.) McCabe further recalls: "I start to strike him again. He lets go of my hand at that point, you know, I can pull my hand out and I'm still not able to get his—get him into custody. I had to be helped by my partner." (ECF No. 49, PageID.1370–1371.) Masserang remembers the struggle on the ground similarly: "Boyd[] had a hold of Officer McCabe's wrist. . . . [T]he reason why I noticed that is because [McCabe's] watch was undone and it was over this thumb so he couldn't open his hand." (ECF No. 49, PageID.1250.)

Eventually, the two officers were able to handcuff Boyd's hands behind his back. At that point, McCabe picked up Boyd by the arms and walked him to the patrol car. Eventually, the officers took Boyd to the jail in Warren.

## 2.

From the officers' perspective, Boyd continued to be defiant and disrespectful during the booking process.

Masserang recalls that as he was entering Boyd's information into the computer, Boyd attempted to vomit on him. During the booking process, Boyd sat handcuffed on a long bench. Although the bench had plenty of room for Boyd to distance himself from Masserang, he instead sat at the end of the bench where Masserang's computer was located. Masserang recalls, "He kept putting his face up towards me in the booking station where I was typing, and he was dry heaving, causing—he said he had a hair in his throat. So he continued to cough in my face, in the direction of where my face was, was within a foot or two, and he continued to do this, along with obnoxious comments and refusing to sit back down." (ECF No. 54, PageID.1555; *see also* Booking Video at 2:34:30.) According to Masserang, "he was dry heaving and attempting to throw up on me." (ECF

No. 54, PageID.1562.) McCabe remembers the situation similarly: "He just kept coughing and essentially just forcing himself to vomit." (ECF No. 54-5, PageID.1482.) So, Masserang recalls, "I turned [Boyd] around with his arms and I told him to stop." (ECF No. 54-6, PageID.1562.) Masserang says he controlled Boyd by using "a wristlock." (*Id.*)

Eventually, Boyd vomited on the ground. A jail officer poured sawdust on the vomit and Boyd was directed to clean up the mess. (ECF No. 54-5, PageID.1482; Booking Video at 2:49:20.) From McCabe and Masserang's perspective, Boyd did anything but that. Boyd had been given a towel to use like a broom and piece of paper or cardboard to use as a dustpan. McCabe recalls, "He . . . took [the] piece of cardboard and flicked [the mess] all over Officer Masserang and I's leg. He was then held down for five or seven seconds, or so, to make sure that he didn't continue doing it." (ECF No. 54, PageID.1482.) Masserang remembers the situation similarly: "[McCabe] didn't put [Boyd] on the ground. He grabbed him and prevented him from getting up, because he was flinging vomit all over the place, and we expect—or, at that point, he was gonna fling it up at us, not just on our legs, but it looked like he was gonna fling it up towards our face area." (ECF No. 54, PageID.1564.)

After Boyd was let up, a jail officer stood Boyd up (apparently by the hair) and pulled him into a holding cell. (Booking Video at 2:56:24.) (There were more altercations later in the morning, but neither McCabe nor Masserang, the only named defendants, were involved in those.)

**B.**

Boyd's account of the night is different from McCabe's and Masserang's.

**1.**

Boyd recalls that late in the night of May 27 or early in the morning of May 28, 2014, three of his friends stopped at his house to pick him up. (ECF No. 54-7, PageID.1608.) According to

Boyd, the foursome then went to a 7-Eleven: "I purchased an orange juice. I think I might have purchased a snack and that's pretty much it." (*Id.*) The group then left the 7-Eleven only to be pulled over by the police a quarter-mile later. (ECF No. 54-7, PageID.1609.) Boyd does not remember whether the person in the front passenger seat was ill or whether the car smelled of marijuana. (ECF No. 54-7, PageID.1610.) Boyd, himself, was not under the influence. (*Id.*)

Boyd recalls Masserang speaking with him through the passenger-side window. According to Boyd, after retrieving his ID from his wallet, "I asked if [Masserang] wanted to see it and he told me 'no.'" (ECF No. 54-7, PageID.1611.) So Boyd held both his ID and his phone in his hands. (*Id.*) Boyd, 22 years old at the time, recalls that he was trying to call or text his dad to let him know that he had been pulled over. (ECF No. 54-7, PageID.1689.)

About that time, McCabe approached the car on the driver's side and, apparently unknown to Boyd, opened his door. Boyd recalls, "I got jabbed with the [flash]light and [McCabe] asked me to get out of the vehicle." (ECF No. 54-7, PageID.1612.) Then, according to Boyd, "I was stepping out of the vehicle, and as I was stepping out, [McCabe] slapped the phone out of my hand . . . . After he slapped the phone out, which he didn't successfully slap it out of my hand. I still had it in my hand. He grabbed me by the front and pushed me into the vehicle, like bashed my head into the door, then pushed me into the vehicle, and then was choking me inside of the vehicle." (ECF No. 54-7, PageID.1613.) Boyd does not recall grabbing McCabe's shirt and believes that he did not grab McCabe's right wrist. (ECF No. 54-7, PageID.1691.)

Boyd also recalls the struggle inside the car differently from McCabe and Masserang. According to Boyd, "[McCabe] was laying on top of me inside of the [car], so there was nothing I could do. He was on top of me. My arms were straight and he was—he had his hands around my neck." (ECF No. 54-7, PageID.1617.) Boyd further remembers, "[McCabe] grabbed my neck and

was choking my neck." (ECF No. 54-7, PageID.1612.) Boyd did not remember West grabbing ahold of him during the struggle in the backseat. (ECF No. 54-7, PageID.1691.) According to Boyd, "[McCabe] got out of the vehicle and tried yanking me out of the vehicle." (ECF No. 54-7, PageID.1612.) "As he pulled me out of the vehicle," says Boyd, "my head hit the—I don't know what it's called—the frame of the car. And then my head hit the cement." (ECF No. 54-7, PageID.1612.)

Boyd also remembers the altercation outside the car differently from McCabe and Masserang. According to Boyd, "[McCabe] got on top of me. Flipped me over, put my hands behind my back and just sat on top of me for a while, and then he started punching me in the head. Then he lifted me up after he punched me a couple times, and then he pushed my head back into the cement. Then he lifted me up by my arms and brought me back to the police car." (ECF No. 54-7, PageID.1612.) Boyd does not remember pulling McCabe's left arm under him. (ECF No. 54-7, PageID.1691.) And while Boyd concedes that he may have tucked his hands under his body, he suggests that he was trying to protect himself from McCabe's strikes. (ECF No. 54-7, PageID.1613–1614.)

**2.**

Boyd's account of what occurred at the jail also differs from McCabe's and Masserang's accounts. Boyd does not recall threatening to vomit on any officer. (ECF No. 54, PageID.1692.) And he denies turning toward Masserang and dry-heaving in an attempt to vomit. (ECF No. 54-7, PageID.1705.)

Like Masserang and McCabe, Boyd recalls vomiting on the floor and being asked to clean it up. But in Boyd's view, he "attempted to" clean up the vomit. (ECF No. 54-7, PageID.1620, 1692.) And Boyd does not remember flicking the mess. (ECF No. 54-7, PageID.1620.) Boyd says

that he was "trying to get where vomit may have splattered." (ECF No. 54-7, PageID.1692.) According to Boyd, "As I was trying to clean up the puke, one of the officers stepped up and pushed my head into the puke. . . . [It was] so humiliating." (ECF No. 54-7, PageID.1622.) Boyd thinks he "probably" got vomit on his face; he says he was "pushed right into it." (ECF No. 54-7, PageID.1622.)

## C.

Boyd was charged and convicted in state court, but his conviction was reversed on appeal. Boyd then went to trial again on charges of disobeying a lawful command and hindering. (ECF No. 49, PageID.1171.) As that trial was nearing its end, Boyd pleaded guilty to "disorderly person." (ECF No. 49-7, PageID.1406.) In pleading guilty, Boyd admitted that he "jostle[d]" with McCabe "on the ground" and that doing so was not an accident or mistake. (ECF No. 49-7, PageID.1412–1413.) Boyd was sentenced to a $150 fine and $150 in costs. (ECF No. 49-7, PageID.1406, 1415.)

## D.

Following his guilty plea, Boyd filed this lawsuit against McCabe, Masserang, and others.

Presently, the focus is on the claims against McCabe and Masserang. Boyd maintains that the two officers violated the Fourth Amendment by using, or failing to prevent the use of, excessive force during the arrest and booking. (ECF No. 11, PageID.137–143.) Boyd also asserts that McCabe and Masserang subjected him to cruel and unusual punishment in violation of the Eighth Amendment. (ECF No. 11, PageID.153.) Boyd also says that the two officers are liable under Michigan law for assault, battery, and intentional infliction of emotional distress. (ECF No. 11, PageID.143–146.)

McCabe and Masserang believe that no reasonable jury could find for Boyd on those claims and thus seek summary judgment. (ECF No. 49.)

The officers' motion was referred to Executive Magistrate Judge R. Steven Whalen for a report and recommendation. Magistrate Judge Whalen recommends granting the officers' motion. (ECF No. 60, PageID.1784.)

Boyd now objects. (ECF No. 71.)

## II.

When, as here, a party objects to a magistrate judge's report and recommendation, the district judge is only required to review de novo those issues properly raised by the objecting party. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Garrison v. Equifax Info. Servs., LLC*, No. 10-13990, 2012 WL 1278044, at *8 (E.D. Mich. Apr. 16, 2012).

So task number one is to determine which issues this Court should address anew. Boyd objects that a jury could find for him on his Fourth Amendment claims. (*See* ECF No. 71, PageID.1887–1893.) But he makes no objection to the Magistrate Judge's recommendation to grant summary judgment on his Eighth Amendment claims. So those are forfeited. *See Thomas*, 474 U.S. at 150; *Garrison*, 2012 WL 1278044, at *8. The same is arguably true of Boyd's state-law claims: Boyd makes a one-sentence objection to the dismissal of his assault, battery, and IIED claims. (ECF No. 71, PageID.1885.) And, usually, such a conclusory objection is not good enough to preserve an issue. *See Farmer v. McBride*, 177 F. App'x 327, 330–31 (4th Cir. 2006); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Here, though, resolution of the assault-and-battery claim is aligned with the resolution of the Fourth Amendment claim. (Indeed, the Magistrate Judge and parties offer virtually the same analysis of both claims.) And addressing the intentional-infliction-of-emotional-distress claim is very straightforward. So the

Court also will address anew McCabe and Masserang's motion for summary judgment on Boyd's Fourth Amendment, assault, battery, and IIED claims.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

In Part III.A, the Court examines Boyd's claim that McCabe and Masserang violated the Fourth Amendment during the arrest. In Part III.B, the Court examines Boyd's claim that McCabe and Masserang violated the Fourth Amendment at the jail. In Part III.C, the Court addresses Boyd's state-law claims.

## A.

By its text, the Fourth Amendment prohibits "unreasonable . . . seizures." And an arrest completed with excessive force is an unreasonable seizure. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020). What is excessive is an objective inquiry: what force would a reasonable officer have used under the circumstances? *See id.*

Here, though, the Court does not simply ask whether the force McCabe used to arrest Boyd was objectively reasonable. McCabe says the doctrine of qualified immunity shields him from a claim that he violated the Fourth Amendment when arresting Boyd. (ECF No. 49, PageID.1114.) That means that it is not enough for Boyd to show that McCabe used unreasonable force; to prevail, Boyd must further show that existing precedent gave McCabe clear notice that the force he used was prohibited by the Fourth Amendment. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Ashford v. Raby*, No. 19-1677, 2020 WL 1057393, at *2 (6th Cir. Mar. 5, 2020) ("[E]ven if [the

officer's] use of force was unreasonable, [the plaintiff] still can't recover unless its unreasonableness was clearly established at the time." (internal quotation marks omitted)).

Accepting Boyd's deposition testimony as true, and drawing reasonable inferences from that testimony in Boyd's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), McCabe used forced that the law clearly prohibited. Under Boyd's account, he was voluntarily exiting the Pontiac when McCabe slapped his phone, grabbed him, "bashed" his head into the car door, pushed him into the backseat of the car, and then "chok[ed]" him. Then McCabe pulled Boyd out by his feet, causing Boyd to hit his head on the car's frame and then the cement. Boyd's version of the events does not include grabbing McCabe's wrist or shirt—he does not recall having done either of those actions. (ECF No. 54-7, PageID.1613, 1691.) So, accepting Boyd's testimony as true, Boyd, who was much smaller than McCabe, was passively exiting the vehicle when, all of a sudden, McCabe grabbed his phone, slammed his head into the car, and then choked him. It was clearly established in 2014 that using that type of force on someone pulled over for a minor offense who is not resisting arrest violates the Fourth Amendment. *See Folks v. Petitt*, 676 F. App'x 567, 572 (6th Cir. 2017) ("As far back as 1999, this court has held that slamming a compliant, non-resisting suspect into a stationary object during an arrest constitutes excessive force."); *Smoak v. Hall*, 345 F. App'x 134, 140 (6th Cir. 2009) ("The law is clear that force can easily be excessive if the suspect is compliant. There is no government interest in striking someone who is neither resisting nor trying to flee."); *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008) ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right.").

To be fair, under the officers' account, Boyd did resist. McCabe says that when he tried to grab Boyd's phone, Boyd grabbed his left wrist. And McCabe says that Boyd grabbed his uniform

as he was falling back into the car. And according to both McCabe and Masserang, Boyd and West were grabbing onto each other in the backseat (or, at least, West was grabbing Boyd) such that McCabe had to pull Boyd out of the car by his feet. Further, reasonableness for Fourth Amendment purposes "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). Thus, under the officers' accounts, McCabe's use of force may well have been reasonable.

But this is summary judgment. And it is for a jury, not a judge, to decide who to believe. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And because a reasonable jury could credit Boyd's account and not the officers', Boyd should get a chance to present his account to a jury. Or, in other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* And, as explained, precedent makes clear that McCabe's actions—as Boyd describes them—amounted to an unreasonable seizure under the Fourth Amendment.

The Magistrate Judge sided with McCabe largely because of a dash-cam video of the arrest. In the Magistrate Judge's view, "the video clearly shows, at 1:27:39-40, that after the cell phone is either taken from or knocked out of his hand, Plaintiff grabs McCabe by the shirt, an act that would be reasonably perceived as physical resistance." (ECF No. 60, PageID.1772.)

This Court agrees with the Magistrate Judge on the law: if a video "blatantly contradict[s]" or "utterly discredit[s]" a plaintiff's account of what happened, a court should not accept the plaintiff's account in deciding a summary-judgment motion. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Where this Court parts ways with the Magistrate Judge, however, is the conclusion that the video "blatantly contradict[s]" Boyd's account. Like a referee engaged in instant-replay review, the Court has watched the arrest portion of the video over a dozen times, including frame-by-frame playback. The video shows McCabe either slapping or grabbing the phone and then Boyd reaching for *something*. (Arrest Video at 1:27:37.) But for what? The video does not show. In fact, even under McCabe's version of the events, when he grabbed Boyd's phone, Boyd grabbed his left wrist—not his shirt. (ECF No. 49-7, PageID.1369.) True, McCabe did say that Boyd eventually grabbed his shirt; but that came a couple seconds later, as the two were falling back into the car. (ECF No. 49, PageID.1365.) In any event, the video does not show Boyd grabbing McCabe's shirt at that later moment either—the view of Boyd is blocked by McCabe's body. (Arrest Video at 1:27:39.) As such, this Court cannot find that the video "utterly discredit[s]" Boyd's testimony that he did not resist arrest.

In finding for McCabe, the Magistrate Judge also relied on a statement by Boyd's counsel that appears in the parties' discovery plan. (ECF No. 60, PageID.1772.) But all that statement says is that Boyd was "needlessly belligerent" when he first interacted with Masserang. (ECF No. 34, PageID.610–611.) This concession did not describe Boyd's interaction with McCabe as Boyd exited the Pontiac.

McCabe and Masserang also suggest that McCabe's use of force was justified because Boyd's use of a cell phone posed a safety risk. Both officers testified that a suspect texting on his phone poses a safety concern for police officers because the suspect may be texting a friend to come to the scene. (ECF No. 49-6, PageID.1246; ECF No. 49-7, PageID.1364.) And, under the law, when a suspect poses an "immediate" threat, the officer's decision to use force becomes more reasonable. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).

While concern over a suspect's use of a cell phone may be valid in some circumstances, this does not appear to be one of them. The officers were investigating an ill passenger and smelled marijuana. As the Magistrate Judge wrote, "this was likely not the most serious crime these officers ever investigated." (ECF No. 60, PageID.1771.) In any event, while the officers' concern over a nearby accomplice might have justified taking Boyd's cell phone, it would not have justified slamming Boyd's head into the car door and then choking him in the backseat.

Accordingly, insofar as Boyd's excessive force claim is based on McCabe slamming his head against the car door, pushing him into the backseat, choking him in the backseat, and pulling him from the car to the ground, McCabe is not entitled to summary judgment.

The Court, however, does agree with the Magistrate Judge that Boyd's Fourth Amendment claim based on the force McCabe used while he was on the ground should not be presented to a jury. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) ("A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions.").

Start with Boyd's own account of what happened on the ground. When Boyd pled guilty to "disorderly person," *see* Mich. Comp. Laws § 750.167(*l*), he admitted that he jostled with McCabe on the ground, and that this jostling was "physical contact." (ECF No. 49-7, PageID.1411–1412.) He further acknowledged that the jostling was not "an accident or mistake." (*Id.*) The doctrine of judicial estoppel prevents Boyd from denying those prior, sworn admissions in order to prevail in this case. *See Grise v. Allen*, 714 F. App'x 489, 495 (6th Cir. 2017); *Sulfridge v. Huff*, 313 F. App'x 820, 825 (6th Cir. 2009). And Boyd does not even completely deny what he said before. In this case, Boyd admits that when he was on the ground, he "could have" tucked his arms under his body. (ECF No. 54-7, PageID.1614.) He explains, "I had somebody . . . on top of me who was a lot heavier than me and . . . he was just punching me repeatedly, so I'm not exactly

sure what was going on with my hands. I'm not sure what was going on with my head, my feet, anything like that. I guess you could say I might have been trying to protect myself." (ECF No. 54-7, PageID.1614–1615.) So under Boyd's own account, he was not passively lying on the ground and allowing McCabe to handcuff him.

And aside from Boyd's account, the officers' assertions that Boyd had a hold of McCabe's arm is not genuinely disputed. McCabe testified that Boyd pulled his arm under him. (ECF No. 49-7, PageID.1369.) Masserang remembers Boyd grabbing McCabe's arm because of McCabe's watch: "I realized that . . . Boyd[] had a hold of Officer McCabe's wrist. And, uh, the reason why I noticed that is because [McCabe's] watch was undone and it was over this thumb so he couldn't open his hand." (ECF No. 49-6, PageID.1250.) And Boyd does not expressly dispute the officers' accounts, saying only he does not remember grabbing McCabe's arm: "Q. Do you recall grabbing Officer McCabe's arm and pulling it under your body? A. I don't recall that." (ECF No. 54-7, PageID.1615.)

As for the video, it does appear that Boyd is not completely compliant when McCabe is atop of him on the ground. (Arrest Video at 1:28:05 to 1:29:02.)

Taking all of these accounts together, and allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397, every reasonable jury would find that it was reasonable for McCabe to have punched Boyd once, maybe twice, to cause Boyd to release his arm and to stop resisting arrest. *See Carter v. Carter*, 728 F. App'x 419, 423 (6th Cir. 2018) (finding, where suspect balled up on the ground during an arrest attempt, "the officer's decision to apply three to four modest punches, rather than, for instance, rolling him over or pulling his arms out from under him, was not

16

constitutionally infirm"); *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012) ("Although Plaintiff insists that he no longer posed a risk of harm or flight after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back. In light of this resistance, we find that Tilli's single use of the taser in drive-stun mode was not gratuitous.").

So far, not much has been said about Masserang's conduct during the arrest. But that is because not much needs to be said. Masserang made no physical contact with Boyd until after McCabe had punched Boyd on the ground. And the video shows that from that point forward, Masserang is helping McCabe handcuff Boyd with limited force—nothing that could be deemed excessive. (Arrest Video at 1:28:14 to 1:29:00.) True, at one point, Masserang pulls Boyd's right arm behind Boyd's back; but he does not do so violently. (Arrest Video at 1:28:26.) Moreover, it appears that Boyd does not truly think that Masserang used excessive force during the arrest; instead it appears that Boyd thinks Masserang violated the Fourth Amendment because he did not prevent McCabe from using excessive force.

Conceptually, that is a viable theory. *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015). But to prove it, Boyd must show that "(1) [Masserang] observed or had reason to know that excessive force would be or was being used; and (2) [Masserang] had both the opportunity and the means to prevent the harm from occurring." *Id.* (internal quotation marks and citations omitted).

Taking the summary-judgment record as whole, no reasonable jury could find that Masserang both knew that McCabe would use excessive force and had the means to stop McCabe. The total time between when Boyd first starts to get out of the Pontiac to when McCabe and Boyd end up on the ground is about 25 seconds. (Arrest Video at 1:27:38 to 1:28:02.) And during that

brief time, Masserang is on the opposite side of the car and engaged with West. (*See id.*) The altercation between McCabe and Boyd arose quickly, and little suggests that Masserang knew it would occur or had any realistic opportunity to prevent it.

\* \* \*

In sum, insofar as Boyd's Fourth Amendment claim is based on McCabe's actions up to the point where Boyd is on the ground, the claim survives summary judgment. But McCabe is entitled to summary judgment on a Fourth Amendment claim based on his conduct while Boyd was on the ground. As for Masserang, he is entitled to summary judgment on Boyd's claim that he violated the Fourth Amendment at any point during the arrest.

**B.**

The Court next considers Boyd's claim that McCabe and Masserang violated the Fourth Amendment during the booking process. Although Boyd's complaint and summary-judgment briefing are not a model of clarity, he apparently believes that McCabe and Masserang are liable for three events that occurred during booking: Masserang reseating Boyd, McCabe pushing Boyd's face into vomit, and Masserang's and McCabe's failure to stop a jail officer from pulling Boyd into a cell by his hair.

**1.**

The Court begins with Boyd's claim that Masserang used excessive force to reseat him on the booking-area bench.

As an initial matter, Masserang had reason to reseat Boyd. Masserang recalls, "[Boyd] kept putting his face up towards me in the booking station where I was typing, and he was dry heaving, causing—he said he had a hair in his throat. So he continued to cough in my face, in the direction of where my face was, was within a foot or two, and he continued to do this, along with obnoxious

comments and refusing to sit back down." (ECF No. 54, PageID.1555.) Boyd denies dry-heaving toward Masserang in an attempt to vomit on him. (ECF No. 54-7, PageID.1705.) But even if what Boyd says is true (and the Court must assume that it is), the video depicts a long bench with plenty of open seating and, yet, Boyd elects to sit right next to Masserang's workstation. And Boyd is not sitting calmly. Instead he is coughing, or, at least, speaking at Masserang while Masserang is entering information in the computer. (*See* Booking Video at 2:34:30–2:35:08.) (Unfortunately, the video is not accompanied by audio, so it is not possible to determine precisely what Boyd is doing.) As Masserang testified, Boyd's face is within a foot or two of Masserang's arm and upper body. (*Id.*) Given the circumstances, Masserang had a valid reason to reseat Boyd.

Since it was not gratuitous for Masserang to reseat Boyd, the question becomes whether the force Masserang used to accomplish that task was reasonable. Masserang recalls, "I turned [Boyd] around with his arms and I told him to stop, because he wouldn't stop, and I told him that he needs to sit down and stop coughing in my face." (ECF No. 54-6, PageID.1562.) Masserang admits that when he turned Boyd around, he put Boyd in a wristlock and pulled up on Boyd's handcuffed arms. (ECF No. 54-6, PageID.1562.) Masserang further admits that this could cause pain. (*Id.*) But, says Masserang, the purpose was to control Boyd and ensure his compliance. (*Id.*)

The video is wholly consistent with Masserang's account. (Booking Video at 2:35:24 to 2:35:46.) From the time Masserang stands Boyd up to the time he sits Boyd back down, only about 22 seconds elapse. (*Id.*) And Masserang appears to be doing exactly as he described: standing Boyd up, turning Boyd around, and then holding Boyd in a wristlock and pulling up slightly on Boyd's handcuffed arms. (*See id.*) The video does not suggest that Masserang used excessive force.

Even Boyd does not describe force that could be fairly deemed excessive. Boyd merely says that Masserang "[p]ushed my head against the wall" and "push[ed] my arms up behind my back as I was handcuffed." (ECF No. 54-7, PageID.1636, 1692.)

In all then, no reasonable jury could find that Masserang used force prohibited by the Fourth Amendment in reseating Boyd. *See Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 697 (6th Cir. 2018) ("Officer Bridson's pushing of Brent—which was not alleged to be unduly violent or forceful—was not unreasonable."); *Lee v. Hefner*, 136 F. App'x 807, 813 (6th Cir. 2005) ("Plaintiffs' own expert, May, conceded that the wrist lock is 'a low level of force with minimal probability of injury.'").

And even if a reasonable jury could find that Masserang used excessive force, Boyd cites no case that would have put Masserang on clear notice that it was unlawful to put an arrestee in a wristlock and pull up slightly on his handcuffed arms to stop him from being a nuisance during the booking process. *See Jackson v. Lubelan*, 657 F. App'x 497, 501 (6th Cir. 2016) ("Jackson offers no case that says that lifting an arrestee's handcuffed wrists to facilitate him moving into a police car violates the Fourth Amendment.").

## 2.

Not long after Boyd was reseated on the booking-area bench, he vomited on the floor. (Booking Video at 2:47:20 to 2:47:55.) After sawdust was poured on the vomit, officers gave Boyd what appears to be a towel and a stiff piece of paper to clean up the vomit-sawdust mixture. (Book Video at 2:49:20 to 2:49:25; 2:53:18 to 2:54:22.) According to McCabe and Masserang, Boyd instead flung the mixture around. Masserang remembers Boyd "flinging vomit all over the place" and thinking that Boyd was not just going to throw the mixture at their legs, but their "face area." (ECF No. 54, PageID.1564.) McCabe recalls, "He . . . took [the] piece of cardboard and flicked

[the mess] all over Officer Masserang and I's leg. He was then held down for five or seven seconds, or so, to make sure that he didn't continue doing it." (ECF No. 54, PageID.1482.)

The video contradicts the officers' account. It is true, as the officers' say, that Boyd flung vomit toward McCabe's leg at one point. (Booking Video at 2:54:25.) And the video does show that Boyd did a poor job of cleaning up; arguably, he made an even bigger mess. But the video also clearly shows that in the seconds before McCabe pushed Boyd's head down, Boyd pushed the vomit-sawdust mixture *away* from the officers. (Booking Video at 2:55:10 to 2:55:17.) At that moment, Boyd's actions did not suggest that he would fling the mixture toward the officers, let alone their faces. (*See id.*) Yet, it is at that moment that McCabe pushed Boyd's face into (or extremely close to) the mixture. (Booking Video at 2:55:19 to 2:55:35.) And McCabe held Boyd's face there for a full 15 seconds. (*See id.*) Thus, a jury listening to Boyd's testimony and viewing the video could reasonably conclude that McCabe pushed Boyd's face into the vomit out of frustration rather than safety. *See Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 408 (6th Cir. 2009) ("[A] reasonable juror could find based on the evidence that Officer Celender pushed Amanda's face into the ground absent a legitimate government interest, namely officer safety."); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) ("[T]he slap cannot reasonably be construed as a means of subduing Pigram, especially given that Chaudoin's justification for the slap was not to protect himself, other officers, or the public, but rather was because Pigram had a 'smart-ass mouth.'"). In other words, based on Boyd's testimony and the video, a reasonable jury could find that it was gratuitous for McCabe to push Boyd's head into the vomit-sawdust mixture. And it was clearly established in 2014 that an officer cannot use gratuitous force on an arrestee. *Morrison*, 583 F.3d at 407 ("'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are

not substantial."); *Lawler v. City of Taylor*, 268 F. App'x 384, 388 (6th Cir. 2008) ("Because our cases clearly established Lawler's right to be free from gratuitous force during booking, the district court properly denied Toro qualified immunity." (citations omitted)); *Pigram*, 199 F. App'x at 513 ("This Court's case law supports Pigram's right not to be slapped gratuitously.").

A reasonable jury could also find Masserang liable for failing to intervene. Masserang was at most a couple feet away from Boyd as Boyd cleaned up the mixture. (Booking Video at 2:55:16.) Masserang faced toward Boyd and, apparently, watched Boyd clean up. (*See id.*) And when McCabe pushed Boyd down, Masserang came over to assist in some fashion. (Booking Video at 2:55:22.) Given that Masserang stood right next to McCabe as McCabe held Boyd down for a full 15 seconds, a reasonable jury could find that there was time for Masserang to realize that McCabe's actions were improper and to intervene. *See Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 853 (6th Cir. 2016) ("Our caselaw clearly establishes that police officers are liable for failing to stop ongoing excessive force when they observe it and can reasonably prevent it.").

**3.**

No reasonable jury could find that McCabe or Masserang should have prevented Boyd from being pulled by his hair into a cell. About a minute after the vomit incident, a jail officer suddenly grabbed Boyd by the hair and pulled Boyd about 10 feet down a hallway and through a doorway. (Booking Video 2:56:24 to 2:56:27.) That took all of three seconds. Three more seconds later, the jail officer placed Boyd inside a holding cell. (Holding Cell Video at 2:56:30.) Boyd offers no evidence that either McCabe or Masserang knew that the jail officer would grab Boyd by the hair. And no reasonable jury could find that six seconds was enough time for McCabe and Masserang to (1) recognize the use of excessive force and (2) prevent the jail officer from using it. *See Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015). As such, neither McCabe

nor Masserang is liable under the Fourth Amendment for failure to stop the jail officer from pulling Boyd by the hair.

\* \* \*

To summarize the analysis of Boyd's Fourth Amendment claims based on McCabe's and Masserang's conduct at the jail, the two officers are entitled to summary judgment on Boyd's claims based on Masserang reseating Boyd and McCabe's and Masserang's failure to stop the jail officer from pulling Boyd's hair. But neither McCabe nor Masserang are entitled to summary judgment on Boyd's claim based on McCabe pushing his face into the vomit-sawdust mixture.

## C.

The Court turns to Boyd's state-law claims of assault, battery, and intentional infliction of emotional distress ("IIED").

Having reviewed all the summary-judgment briefing and all the briefing associated with Boyd's objections, at no point do the officers or Boyd treat an assault claim or a battery claim differently from an excessive force claim under the Fourth Amendment. Nor does either side treat qualified immunity under federal law differently from governmental immunity under Michigan law.[1] Given that both sides believe that the assault and battery claims rise and fall with the Fourth Amendment claims, the Court sees no reason to treat those state-law claims differently from the federal claim.

---

[1] The Court notes that under Michigan's governmental immunity statute, the officers are only liable for intentional torts if they acted without good faith or acted with malice. *See Odom v. Wayne Cty.*, 760 N.W.2d 217, 229 (Mich. 2008). In contrast to qualified immunity, this inquiry is subjective. *See id.* But McCabe and Masserang not only have the initial burden on summary judgment, they also have the burden of establishing governmental immunity. *See id.* at 227–28. And the two officers have not argued that the difference between qualified and governmental immunity leads to different outcomes for Boyd's federal and state claims.

With one exception: the Court does not understand how Masserang could be liable for assault or battery—both intentional torts—for his failure to stop McCabe during the arrest or at the jail. And Boyd's summary-judgment briefs and his objections do nothing to help the Court understand. As far as this Court can tell, Masserang was not McCabe's supervisor and he did not direct McCabe to use force against Boyd. Accordingly, the Court will grant Masserang summary judgment on all of Boyd's assault and battery claims.

That leaves Boyd's claims of IIED against the two officers. Even if a jury believes Boyd's assertions that he suffered humiliation and "off the charts" anxiety (ECF No. 54-7, PageID.1622, 1642–1643), he must still convince the jury that McCabe's and Masserang's actions were "extreme and outrageous." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985). The Michigan Supreme Court has described that type of conduct as "'beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 908–09 (quoting Restatement (Second) of Torts § 46 (1965)). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 909 (internal quotation marks omitted). The Court doubts very much that any reasonable juror would find that McCabe and Masserang's conduct was "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." So McCabe and Masserang are entitled to summary judgment on Boyd's IIED claims.

### D.

Before wrapping up, there is one last issue to address. Aside from arguing that they are entitled to summary judgment, McCabe and Masserang also argue that Boyd's case should be dismissed under Rule 37 for failure to comply with a discovery order or under Rule 41 for failure

to prosecute. Magistrate Judge Whalen did not address these assertions because he found that McCabe and Masserang were entitled to summary judgment. (ECF No. 60, PageID.1784.) But this Court has found that some of Boyd's claims are not subject to summary judgment. So McCabe and Masserang's Rule 37 and Rule 41 arguments should be addressed.

While this Court could address those arguments, the better course is to permit Magistrate Judge Whalen to address them in the first instance. The basis for McCabe and Masserang's Rule 37 argument is that Boyd has not paid the sanction that Magistrate Judge Whalen had imposed earlier in the proceedings. And the basis for the officers' Rule 41 argument relates to Boyd's conduct throughout this case (primarily in discovery). Magistrate Judge Whalen has handled all pretrial matters in this case and is in a better position to decide whether Boyd's case should be dismissed under Rule 37 or Rule 41.

## IV.

For the reasons given, the Court ACCEPTS IN PART and REJECTS IN PART the Magistrate Judge's report and recommendation (ECF No. 60).

The Court GRANTS IN PART and DENIES IN PART McCabe and Masserang's motion for summary judgment (ECF No. 49). In particular, the Court ORDERS as follows:

- McCabe is not entitled to summary judgment on Boyd's Fourth Amendment, assault, and battery claims to the extent those claims are based on McCabe's actions during the arrest up through the point where Boyd hits the ground;

- McCabe is not entitled to summary judgment on Boyd's Fourth Amendment, assault, and battery claims to the extent those claims are based on McCabe holding Boyd's face in or near vomit at the jail;

- McCabe is entitled to summary judgment on Boyd's Fourth Amendment, assault, and battery claims to the extent those claims are based on McCabe's actions during the arrest while Boyd is on the ground;

- McCabe is entitled to summary judgment on Boyd's Fourth Amendment claim based on McCabe's failure to stop the jail officer from pulling Boyd by the hair;

- McCabe is entitled to summary judgment on all of Boyd's claims of intentional infliction of emotional distress;

- Masserang is entitled to summary judgment on all of Boyd's Fourth Amendment claims *except* for Boyd's claim that Masserang should have stopped McCabe from holding Boyd's face in or near vomit at the jail;

- Masserang is entitled to summary judgment on all of Boyd's claims of assault, battery, and intentional infliction of emotional distress;

- McCabe's and Masserang's motion to dismiss under Rule 37 and Rule 41 is DENIED WITHOUT PREJUDICE to refiling.

If McCabe and Masserang still believe that this case should be dismissed under Rule 37 or Rule 41, they shall file a motion to dismiss on those grounds; Magistrate Judge Whalen will then address that motion in the first instance.

SO ORDERED.

Dated: March 30, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE